HERBERT KAHN ET AL., HEIRS-AT-LAW OF MERVINE KAHN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7864.    Decided September 30, 1926.

Where there is no evidence that property transferred within three months prior to the date of death was not transferred in contemplation of death, *held*, that the transfer was made in contemplation of death within the meaning of the statute.

*Victor Canfield, C. P. A.*, for the petitioners.
*J. Arthur Adams, Esq.*, for the respondent.

This is a proceeding for the redetermination of a deficiency in estate tax in the amount of $1,061.90, arising from the inclusion in the gross estate of the value of certain shares of stock transferred by the decedent within approximately ten weeks prior to the date of his death.

FINDINGS OF FACT.

Mervine Kahn died March 6, 1924, a resident of Rayne, La., at the age of 69 years. The cause of death noted on the certificate of death made to the Louisiana State Board of Health was angina pectoris.

The decedent at one time owned all the shares in the Mervine Kahn Co. This corporation was organized in 1914 with a capital stock of $75,000, divided into 750 shares of the par value of $100 each. In the year of its organization the decedent gave to each of his six children five shares of stock of the corporation, and about five years later he gave each child ten additional shares, leaving 660 shares standing in his own name. On December 22, 1923, the corporation declared a stock dividend of 100 per cent, and thereupon the decedent directed the corporation to issue the 660 additional shares of stock declared as a dividend upon his shares to his wife. The value of these shares on December 22, 1923, was $43,543.50. The petitioners did not include the value of these shares as a part of the gross estate of the decedent in the estate-tax return made to the Federal Government. The Commissioner amended the estate-tax return by including such value, and the deficiency results therefrom.

The decedent was a prominent business man of Rayne, La. He apparently enjoyed good health until about 1921, when an examination by his family physician, made at his request, reflected a condition of high blood pressure, due probably to the existence of certain digestive disorders. The physician advised the decedent of his high blood pressure and prescribed diet and medicines for such condition. A little later the physician went with decedent to New Orleans for an X-ray examination. The decedent's entire intestinal tract and his heart and lungs were X-rayed and thoroughly examined. The doctor making the examination informed the family physician that there was an enlargement of the heart, that there was some intestinal disturbance, and that decedent's food did not go through his stomach in the proper length of time. During the year 1922 or 1923, the decedent, apparently of his own volition, went to New Orleans and consulted a specialist in diseases of the heart and lungs. This specialist communicated with the decedent's family physician in Rayne and advised him of the enlargement of the heart and high blood pressure. The family physician did not consider that the decedent's condition was very serious—the blood vessels were normal and there was no evidence of diabetes or arteriosclerosis. In 1921, the decedent had an operation for double hernia. A local anaesthetic instead of a general anaesthetic was used in the performance of this operation. The decedent apparently fully recovered from such operation.

Near the latter part of 1923 the decedent suffered a violent heart attack. A physician, hastily summoned, found him in an unconscious condition and administered a hypodermic injection of atropine followed by other stimulants. The trouble was diagnosed as angina pectoris, but this physician was not the family physician and did not inform the decedent of the nature of the attack. There was another similar attack that occurred near the time of this one.

The decedent had always been a very active man and was engaged in many businesses. In addition to his activities in connection with the Mervine Kahn Co., he was president of the Rayne State Bank, which position he resigned in 1922. The decedent was not given to talking about his health, although he had stated to neighbors and to a physician at different times during the later years of his life that he did not feel well. In the opinion of this physician, who knew him intimately, he was in declining health during the last three or four years of his life. He did, however, keep up his activities in connection with the Mervine Kahn Co., and shortly prior to his death contemplated and discussed with his sons the expansion of the business and the opening of a branch at Crowley, La. He was at his place of business on the day before his death.

In addition to gifts of shares of stock in the Mervine Kahn Co. to his sons at the date of incorporation of that company and in 1918 or 1919, he had made a gift of stock in the Rayne State Bank to his wife. When he instructed the secretary and treasurer of the Mervine Kahn Co. to issue to his wife the additional shares of stock to which he became entitled through the stock dividend declared on December 22, 1923, he stated that his wife should have been interested in the company from the beginning and he wanted her to have the 660 shares coming to him. The stock dividend was declared only after the decedent had been advised by a tax consultant as to the effect such stock dividend would have upon tax liability.

The decedent died intestate.

### OPINION.

SMITH: The taxing statute requires the inclusion in the gross estate of a decedent of the value of property transferred in contemplation of death, and further provides that:

Any transfer of a material part of his [decedent's] property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such a consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title. Revenue Act of 1921, section 402(c).

The only question here is whether the transfer of the right to receive the shares of stock payable to the decedent as a stock dividend was made in contemplation of death. The following definition of the statutory phrase " in contemplation of death," frequently quoted by State and Federal courts, is given in the case of *Rosenthal* v. *People*, 211 Ill. 306; 71 N. E. 1121:

A gift is made in contemplation of an event when it is made in expectation of that event and having it in view; and a gift made when the donor is looking forward to his death as impending, and in view of that event, is within the language of the statute.

The New York courts, in *In re Baker's Estate*, 82 N. Y. S. 390; affd. 70 N. E. 1094, said:

This court has held that the words " in contemplation of death " do not refer to a general expectation which every mortal entertains, but rather the apprehension which arises from some existing condition of body or some impending peril; * * * and this we believe is now the generally accepted definition of the phrase.

In *State* v. *Pabst*, 139 Wis. 561; 121 N. W. 351, the court said:

The words [in contemplation of death] are evidently intended to refer to an expectation of death which arises from such a bodily or mental condition as prompts persons to dispose of their property and bestow it on those whom they regard as entitled to their bounty.

Whether a gift has been made in contemplation of death is almost uniformly treated in the administration of tax laws as a question of fact. *Spreckels* v. *State*, 30 Cal. App. 363; 158 Pac. 549; *People* v. *Kelley*, 218 Ill. 509; 75 N. E. 1038; *Shwab* v. *Doyle*, 269 Fed. 321. It is proper that the presumption of fact afforded by the statute be taken into account in determining whether the gift was made in contemplation of death. *Shwab* v. *Doyle*, *supra*.

In the instant case the facts not only fail to overcome the presumption provided by the statute, but they show in themselves that the decedent must have been aware of impending death at or about the time of the transfer. He had been in declining health for several years prior to his death. He knew that he had high blood pressure. He consulted a specialist in New Orleans of his own volition. On at least two occasions a few months before his death he had suffered violent heart attacks. Those attacks occurred at some time near the date of the transfer, the evidence not disclosing whether before or after that date.

*Judgment for the Commissioner.*